FOR PUBLICATION

HELEN HUGEE,

                                   Plaintiff,

            - versus -

KIMSO APARTMENTS, LLC, and JOHN
DOE BUSINESS ENTITY,

                                   Defendants.

MEMORANDUM
AND ORDER
11-CV-4996 (JG) (RER)

JOHN GLEESON, United States District Judge:

            Helen Hugee sued her landlord, Kimso Apartments, LLC ("Kimso"), and the business entity that manages her apartment building, for disability discrimination. After the suit was filed, Kimso completed all of Hugee's desired repairs and Hugee no longer felt any need to continue her lawsuit. Hugee settled with the defendants for $500 cash, but the settlement agreement, which was signed outside the presence of Hugee's attorney and without his knowledge, did not make any provision for attorney's fees. Hugee's attorney, Adam Hanski, here seeks an award of attorney's fees and costs. For the reasons explained below, Hugee's motion for attorney's fees and costs is granted to the extent of the amount set forth herein.

BACKGROUND

A.      *Facts*

            The court held two evidentiary hearings on this matter – one on January 5, 2012, and another on January 27, 2012. The court finds the following facts based on the testimony and exhibits introduced at the hearings.

Helen Hugee is a resident of 240 Park Hill Avenue, Apartment 2C, Staten Island, New York, 10304, and a tenant of the defendant Kimso. Hugee at 8.[1] Hugee is disabled and has been confined to a wheelchair for seven years. *Id.* at 9. The Park Hill Apartment complex comprises a total of 1300 units, of which Kimso owns 400. Shah at 81. Unithree Investment Corp. ("Unithree") manages Kimso's Park Hill Apartment units pursuant to a contract with Kimso. *Id.*

On multiple occasions prior to mid-2011, Hugee asked Kimso to make modifications to her apartment that she (correctly) believed were required by law: the doorways to her kitchen, bedroom and bathroom needed widening; the kitchen and bathroom cabinets needed lowering; and grab bars needed to be installed next to the shower and toilet in her bathroom. Hugee at 13, 29. Kimso refused to make Hugee's requested modifications unless Hugee paid for them. *Id.* at 13. Hugee's requests were generally made orally to her apartment building's rental or management office. *Id.* at 15.

Weary of living in apartments they felt did not comply with the federal and state anti-discrimination laws, Hugee and some other disabled tenants, including Thomas Nimely, discussed getting help from a lawyer. *Id.* at 14, 27-28. Through Nimely, Hugee was introduced to her current attorney, Adam Hanski. *Id.* at 14, 28.

At Hugee's invitation, Hanski came to Hugee's apartment to discuss her need for the structural alterations described above. *Id.* at 28-30. Hanski agreed to represent Hugee in her effort to get Kimso to make the alterations at its own expense, not Hugee's. The plan was to first send a letter requesting that the work be performed. *Id.* at 14-15. If the landlord did not respond

---

[1]    I will use the testifying witness's name paired with the transcript page number to refer to witness testimony from the hearings on January 5, 2012, and January 27, 2012. Hugee testified at the January 27, 2012, hearing. All other testifying witnesses testified at the January 5, 2012, hearing.

to the letter requesting modifications and accommodations, Hugee and Hanski agreed that Hanski would file a lawsuit on her behalf.  *Id.* at 22.

Hanski ghost-wrote a letter for Hugee addressed to Kimso and dated September 16, 2011.  It requested all of the above-mentioned modifications to Hugee's apartment, as well as the following modifications to the shared areas of the apartment building: (1) installation of a ramp at the main entrance; (2) repair and maintenance of a ramp at the back of the building; and (3) elevator maintenance, repair or replacement and the provision of alternative accommodations when the elevator is out of service.  *Cf.* Ex. G;[2] Ex. B (*Nimely*, ECF No. 20); Compl. ¶¶ 28-31, ECF No. 1.[3]  The letter requested that Kimso contact Hugee regarding these modification requests no later than October 3, 2011.  *See* Compl. ¶ 32.

Not having received a response to this letter, Hanski filed this lawsuit on October 13, 2011, alleging that Kimso had repeatedly refused or ignored Hugee's reasonable accommodation requests.

Unithree eventually responded to Hugee's letter.  In a letter to Hugee dated October 27, 2011, Unithree agreed to lower the cabinets in Hugee's bathroom and kitchen and to install grab bars next to her shower and toilet, at its own expense.  Ex. G.  Unithree also agreed to "determine the financial and structural feasibility of widening" her kitchen, bathroom, and bedroom doorways.  *Id.*  Unithree refused to install a ramp at the front of the building, and it

---

[2]        Many of the exhibits used at the two evidentiary hearings are filed on the docket for this case under their exhibit numbers at docket entries 20-27 on ECF.  I will refer to these exhibits simply as "Ex. --."  Other exhibits used at the hearing were filed in the dockets of the related cases of *Davis v. Kimso Apts., LLC*, No. 11-CV-5151 (JG) (RER) (E.D.N.Y.) ("*Davis*"), and *Nimely v. Kimso Apts., LLC*, No. 11-CV-4997 (JG) (RER) (E.D.N.Y.) ("*Nimely*").  I will refer to these exhibits as "Ex. --," followed by the short form of the case in which it is filed ("*Davis*" or "*Nimely*") and its electronic docket entry information in parentheses.

[3]        This September 16, 2011, letter from Hugee has not been provided to the court nor entered into evidence.  I am left to surmise its contents through inference from various other sources, including Kimso's response letter (Ex. G) and a similar letter that Hanski drafted for Nimely (Ex. B, *Nimely*, ECF No. 20), as well as general witness testimony about the letter.  Hugee's Complaint also describes this letter and its contents, *see* Compl. ¶¶ 28-32, although Kimso's Answer denies each of these allegations without elaboration, *see* Ans., ECF No. 8.

agreed to replace the ramp at the back of the building only if Hugee would pay for it. *Id.*
Finally, Unithree stated that it "makes great efforts at ensuring the continuous operability and
safety of the elevator in your building." *Id.*

Kimso began making the modifications to Hugee's apartment on or around
November 15, 2011. Hugee at 23-24; *see also* Ex. H. Kimso made all of the repairs that Hugee
requested inside her apartment unit. Ruiz at 145-46; Hugee at 16-17. The work took about 20
days and was completed around December 12, 2011. Ruiz at 145; Hugee at 17; *see also* Ex. J.
Hugee was happy and satisfied with the work. Ruiz at 146; Hugee at 17-19, 21-22. Once the
repairs were done, Hugee no longer felt any need to continue with her lawsuit. Hugee at 18, 21-
22.

Meanwhile, when he learned of this lawsuit (and of the companion lawsuits filed
by Nimely[4] and another disabled tenant named Alona Davis[5]), Darshan Shah, the Vice President
of Unithree,[6] was not pleased. Shah summoned Hugee's younger sister, Minnie Graham, with
whom he coincidentally had a professional connection. Shah at 83-84. Graham, a former tenant
of Kimso, works for an entity called Empowerment Zone, Inc., a community-based organization
that enjoys free office space in the Park Hill Apartment complex and has a consulting
arrangement with Unithree. Graham at 122-23. Shah sent Graham to speak to her sister about
the lawsuit. Graham at 114. Graham reported back to Shah that Hugee was not aware that a
lawsuit had been filed on her behalf. *Id.*

Shah thereupon set upon a course to avoid paying attorneys' fees in any of the
three cases and to ruin Hanski. In early December 2011, Shah prepared various documents for

---

[4]     *See Nimely v. Kimso Apts. LLC*, No. 11-CV-4997 (JG) (RER) (E.D.N.Y.).
[5]     *See Davis v. Kimso Apts. LLC*, No. 11-CV-5151 (JG) (RER) (E.D.N.Y.).
[6]     Shah is a practicing physician who works as an internist and cardiologist in Brooklyn. Shah at 89.
He visits the Kimso apartment complex to perform his Unithree duties about once or twice a week. *Id.*

Hugee, Davis and Nimely to sign. One was a settlement agreement purporting to resolve each tenant's respective lawsuit for a sum of $100.[7] *See* Ex. I. Another was an acknowledgment by affidavit of the work that had been completed in the tenant's apartment, which also stated that Kimso "has not discriminated against me due to my disability in any form, way, shape or manner and actually treated me and my disability with the utmost respect and shown commendable sensitivity." *See* Ex. J. A third was a letter from each tenant addressed to Hanski with the subject line "Firing you acting as my lawyer . . . ." *See* ECF No. 10 at 2; *see also Davis*, ECF No. 9, Ex. C. The letter falsely stated that Hanski appeared at the tenant's apartment door, unannounced and uninvited, and offered his legal services; that Hanski had gotten the tenant to sign papers without explaining what they were; that the tenant had never told Hanski that he or she had been subjected to disability discrimination by Kimso; that Hanski never told the tenant that he would start a lawsuit on his or her behalf; and that the tenant had settled the case with the landlord without Hanski's help. *Id.* The letter purported to fire Hanski and to warn him not to contact the tenant again. *Id.*[8]

Shah then got Graham – whose bias in favor of Kimso and Unithree was patent – to visit Hugee in her apartment on December 12, 2011, and induce her to unknowingly sign each of these documents. *See* Exs. I, J; ECF No. 10. Motivated by her business relationship with

---

[7]     When Hugee signed her settlement agreement, she crossed out $100 and changed it to $500. *See* Ex. I. Shah had authorized Graham to offer up to $500 cash to the tenants to sign the settlement agreements. Shah at 130.

[8]     Shah also prepared another letter for the tenants' signatures that was addressed to the Clerk of the Court of the Eastern District of New York. *See* Ex. Q; *see also* ECF No. 10 at 1. It stated that "[t]here never was any discrimination done against me due to my disability by my landlord," "[t]he lawsuit was started without my knowledge or consent," "I never asked Mr. Hanski to start a lawsuit in my name," "Mr. Hanski never informed me or advised me that there was going to be a lawsuit," "I have fired Adam Hanski as my lawyer," "I have made direct settlement with Kimso Apartments," and "I am sorry that the Court's time was wasted in my name – all due to the unnecessary and irresponsible action of Mr. Hanski." *Id.* Hugee also signed this letter on December 12, 2011. *Id.* This letter together with the letter firing Hanski were mailed to the court via certified mail on December 15, 2011, received by the court on December 22, 2011, and entered on the docket as filed on December 16, 2011. *See* ECF No. 10.

Unithree, Graham did one of the very things the letter falsely accused Hanski of doing – that is, she got her sister to sign a document without explaining what was in it.

Worse yet, Shah used Graham to manipulate Hugee to sign a serious misconduct complaint about Hanski to the New York State Bar Association. *See* Ex. P. The letter falsely stated that Hanski came to Hugee's home uninvited as part of his practice of "preying on poor people, like me, who are disabled." *Id.* The letter falsely accused Hanski of conduct that was "unprofessional and unethical at best and outright predatory and fraudulent at worst." *Id.* It called for an investigation of Hanski and asked that he be disciplined. *Id.* Hugee signed this document, along with the others, at Graham's urging on December 12, 2011. *Id.*

It was Shah who was doing the preying on disabled people, not Hanski. In fact, Hugee was pleased with Hanski, whose legal services she had sought, along with her fellow tenants. Once Hanski arrived on the scene, they got the physical alterations that had been repeatedly denied in the past.

As odious as Shah's conduct in connection with Hugee's case was, it pales in comparison to what he did with respect to the cases filed by Davis and Nimely. With no basis at all to conclude they were dissatisfied even in the slightest with Hanski, he prepared a similar set of false documents for Davis and Nimely to sign, including identical complaints to the New York States Bar Association. Shah in fact did not believe that Hanski was victimizing anyone. Rather, he believed he could manipulate the three disabled tenants into signing false statements simply by finally doing the required work on their apartments. By taking advantage of the disabled tenants in this way, he believed he could terminate the lawsuits without paying Hanski's legal fees and teach Hanski a lesson not to represent any of his tenants.

Shah got Graham to get Hugee to unknowingly sign the phony accusatory documents. He got a maintenance employee, Luis Ruiz, to similarly prevail on the infirm Davis, who has since died. Shah at 95; *see also Davis*, ECF No. 9 (attaching signed documents as exhibits); *Davis*, ECF No. 26 (announcing death). And through Graham he tried repeatedly to get Nimely to sign them as well.

Graham and another woman named Marjorie Garvin visited Nimely's apartment on numerous occasions. Nimely at 14, 15-16; Shah at 101; Graham at 130-31. Graham and Garvin told Nimely that his lawyer was no good and offered him money if he would sign the papers. Nimely at 16, 19.[9] But Nimely, who was pleased with Hanski as his lawyer, refused. Graham at 130-31. The refusal immediately resulted in a retaliatory letter stating that he owed back rent. Nimely at 20; *see also* Ex. 2 (*Nimely*, ECF No. 18) (ten-day notice).

Finally, Shah got Graham to induce Hugee to stay away from the evidentiary hearing on January 5, 2012. Graham at 127. The reason they needed to do so was obvious when Hugee appeared at the Court's direction on January 27, 2012, and testified to what had really happened.

B.    *Procedural History*

This lawsuit was commenced on October 13, 2011. *See* Compl. The Complaint alleged that Kimso had repeatedly refused or ignored Hugee's reasonable accommodation requests, and asserted causes of action for: (1) violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*;[10] (2) violation of Title III of the Americans with Disabilities Act

---

[9]    Graham and Garvin did not offer a specific amount to Nimely, but told him they'd "give him some money for Christmas," but that he shouldn't be "ridiculous" or "extravagant" in the amount that he asked for. Nimely at 19-20.

[10]    The FHA prohibits, in relevant part, the "refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford [a] person [with disabilities] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Department of Housing and Urban Development ("HUD") regulations provide examples of reasonable accommodations under the FHA, which include

("ADA"), 42 U.S.C. § 12181; (3) violation of New York State Executive Law § 296; (4) violation of the Administrative Code of the City of New York ("NYC Admin. Code" or "NYC Human Rights Law") § 8-107;[11] (5) violation of New York State Civil Rights Law § 40; (6) common law negligence; and (7) breach of the warranty of habitability.  Compl. ¶¶ 38-125.

On December 22, 2011, this court received a letter apparently from Hugee dated December 12, 2011, addressed to the Clerk of the Court, informing the court that this lawsuit was commenced without Hugee's knowledge, consent or authorization.  ECF No. 10.  The letter further stated that Hugee had fired Hanski as her lawyer, and attached the letter purporting to discharge Hanski as her attorney.  *Id.*  The letter also stated that Hugee had settled with Kimso and that "[t]here never was any discrimination done against me due to my disability by my landlord."  *Id.*  The letter concluded by saying, "I am sorry that the Court's time was wasted in my name – all due to the unnecessary and irresponsible action of Mr. Hanski."  *Id.*

---

allowing the use of a seeing-eye dog in spite of a no-pets policy and allowing the reservation of a parking space in spite of a general first-come first-served parking policy.  *See* 24 C.F.R. § 100.204(b).  Such reasonable *accommodations* are distinct from reasonable *modifications* that are "necessary to afford [a] person [with disabilities] full enjoyment of the premises," which the FHA prohibits a landlord from refusing to permit the tenant to undertake at the tenant's expense, but does not require the landlord to undertake at its own expense.  *See* 42 U.S.C. § 3604(f)(3)(A).  Examples of reasonable modifications are the installation of grab bars and the widening of doorways.  *See* 24 C.F.R. § 100.203.  The FHA also prohibits retaliation for the exercise of FHA rights: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . of this title."  42 U.S.C. § 3617.

[11]    Section 8-107(5) (contained in chapter 1 of title 8) of the Administrative Code of the City of New York prohibits landlords and managing agents of housing accommodations from "discriminat[ing] against any person because of such person's actual or perceived . . . disability."  The section also requires the landlord to "make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."  *Id.* § 8-107(15).  "The term 'reasonable accommodation' means such accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business."  *Id.* § 8-102(18).  The section also prohibits retaliating against a tenant because she has "(i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, [or] (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter."  *Id.* § 8-107(7).  Section 8-502 provides a private cause of action for violations of the NYC Human Rights Law as follows:

> Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title . . . shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate . . . .

On December 27, 2011, Hanski filed a letter contesting that he had solicited Hugee as a client without invitation, and stating that Hugee had told him she was happy with his services. ECF No. 12. The letter also stated that Hugee had told Hanski that she was unaware that she had signed any letters addressed to the court or to the Bar Association or otherwise complaining about Hanski's representation. *Id.*

On December 28, 2011, Hanski filed a motion for a protective order to prevent Kimso from communicating with Hugee or her family about the action. ECF No. 13. The motion also sought an order voiding the false letters that Hugee denied signing. *Id.*

Also on December 28, 2011, Kimso opposed the effort to void the false documents and the entry of a protective order. ECF No. 15. Counsel for Kimso represented that any communications between Kimso and Hugee had been done in the absence of Kimso's counsel. *Id.* Kimso's counsel stated that the principals of the lawsuit should be encouraged to communicate with each other to resolve their dispute without the assistance of counsel "to avoid swelling the Court's docket with frivolous and unripe actions, as in this case." *Id.* at 2. Kimso's counsel attached as exhibits to its letter the Acknowledgment by Affidavit (that we now know was drafted by Shah) that Hugee signed on December 12, 2011, acknowledging that her requested repairs had been completed and stating that Kimso "has not discriminated against me due to my disability in any form, way, shape or manner and actually treated me and my disability with the utmost respect and shown commendable sensitivity." ECF No. 15, Ex. A. Next to the typed words reading, "Management has also agreed to place me on the priority transfer list for a lobby floor apartment," Hugee wrote by hand, "I am completely satisfied with my current apartment and have no desire to transfer," next to which she placed her initials. *Id.*

On January 5, 2012, Hanski filed a motion to strike and void each of the letters purportedly signed by Hugee that were mailed to the Clerk of Court. ECF No. 17. Hanski attached a handwritten affidavit signed by Hugee on January 3, 2012, stating in full:

> I, Helen Hugee, authorize my attorney, Adam Hanski, Esq. of Hanski Law Practice, LLC[,] to settle the case on my behalf, by either settling the lawsuit for the work done in my apartment along with an appropriate payment of attorney's fees to Hanski Law Practice, LLC, Adam Hanski, Esq. by Kimso Apartments, LLC, or by Adam Hanski, Esq. filing a motion for attorney's fees and thereafter discontinuing the lawsuit after such attorney's fees are paid. To clarify, Adam Hanski, Esq., never came to my door and solicited me. I authorized the lawsuit to be filed on my behalf.
>
> Sincerely,
> Miss Helen E. Hugee.

ECF No. 17, Ex. A.

On the morning of January 5, 2012, the court held an evidentiary hearing to determine whether Hugee's lawsuit had been settled, whether to strike or void the letters filed with the court, and whether any protective order should issue. *See* ECF No. 18 (minute entry for January 5, 2012, evidentiary hearing). The hearing also addressed similar disputes in the related cases of *Davis* and *Nimely*. Thomas Nimely, Daniel Bagliore, Darshan Shah, Minnie Graham, and Luis Ruiz testified at the hearing. Hugee did not appear.

On January 27, 2012, the court continued the hearing to hear testimony from Hugee. Based on the evidence presented at the two hearings, the court made some factual findings on the record. The court found that Hugee's case has been settled, pending a determination of attorney's fees. The court also stated on the record that, disturbingly with the complicity of her own sister, Hugee had been induced to sign a false letter dated December 12,

2011,[12] that mischaracterized Hanski's conduct and Hugee's understanding of her lawsuit. The court reserved any determination regarding Hanski's attorney's fees, encouraging the parties to settle the dispute without litigation, and suggesting that the parties agree to pay reasonable attorney's fees and stipulate that the court decide the amount of the fee. Although the parties indicated they were open to this option, apparently no such agreement has been reached, because the question of the fee award has since been aggressively litigated.

On February 8, 2012, Hanski filed his motion for attorney's fees, seeking an award of $57,030 in fees and costs, exclusive of any fees or costs accruing due to work on the fee motion itself. Pl.'s Mo. for Atty Fees, ECF No. 30. On February 17, 2012, Kimso opposed any fee award, and also "strongly dispute[d]" Hanski's "egregiously excessive fee submissions." Kimso Opp., ECF No. 31. Hanski filed a reply on February 22, 2012, ECF No. 32, to which Kimso filed a surreply on March 5, 2012, ECF No. 34. On March 8, 2012, Hanski filed an opposition to Kimso's surreply. ECF No. 35. On March 9, 2012, this court entered an order directing the parties not to file any more submissions regarding Hanski's motion for attorney's fees unless and until expressly requested to do so by the court. The motion has been fully briefed.

DISCUSSION

A.    *Eligibility for a Fee Award: "Prevailing Party" Status*

Both city and federal law condition a fee-shifting award on the party's achieving "prevailing party" status. *See* 42 U.S.C. § 3613(c)(2) ("In a civil action [alleging a discriminatory housing practice], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs."); NYC Admin. Code § 8-

---

[12]    The court misstated orally that the letter was dated December 13, 2011; however, all the letters complaining about Hanski were in fact signed and dated December 12, 2011. *See* Exs. P, Q; ECF No. 10.

502(f) ("In any civil action [by a person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title], the court, in its discretion, may award the prevailing party costs and reasonable attorney's fees.").  Therefore, the threshold question in deciding whether to award attorney's fees and costs is whether Hugee was a prevailing party. Federal and city law have different standards for answering that question.

1.    *The Fair Housing Act*

The Supreme Court has rejected the so-called "catalyst theory" as a basis for an award of attorney's fees under federal law.  In *Buckhannon*, an FHA and ADA case, the Supreme Court described the catalyst theory as positing that "a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct."  *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 601 (2001).  Although most Courts of Appeals at the time had approved of it, the Supreme Court rejected the catalyst theory as a basis for a fee award on the ground that it "allows an award where there is no judicially sanctioned change in the legal relationship of the parties," and the change "lacks the necessary judicial *imprimatur*."  *Id.* at 605.  Attorney's fees, the Court instructed, should not be awarded based on a mere "nonjudicial alteration of actual circumstances."  *Id.* at 605 (internal quotation marks omitted).

The Court based its rejection of the catalyst theory on the plain meaning of the term "prevailing party," which the Court held to mean "one who has been awarded some relief by the court."  *Id.* at 603.  The Court also expressed concern that recognizing the catalyst theory would "spawn[] a second litigation of significant dimension," because the analysis, which requires the court to determine "whether the lawsuit was a substantial rather than an insubstantial cause of the defendant's change in conduct" and "whether the defendant's change in conduct was

12

motivated by the plaintiff's threat of victory rather than threat of expense," is a "highly factbound inquiry" and "is clearly not a formula for ready administrability." *Id.* at 609-10 (internal quotation marks omitted).

"[I]n order to be considered a 'prevailing party' after *Buckhannon*, a plaintiff must not only achieve some 'material alteration of the legal relationship of the parties,' but that change must also be judicially sanctioned." *Roberson v. Giuliani*, 346 F.3d 75, 79 (2d Cir. 2003) (quoting *Buckhannon*, 532 U.S. at 604) (§ 1983 case); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) (holding that the same standards are "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party'"). The *Buckhannon* Court concluded that "enforceable judgments on the merits" and "settlement agreements enforced through a consent decree" constitute sufficient "material alteration[s] of the legal relationship of the parties" to justify attorney's fee awards. *Id.* at 604-05 (internal quotation marks omitted). The Second Circuit has subsequently held that these two forms of relief identified in *Buckhannon* were merely "examples" rather than the exclusive avenues to achieving prevailing party status. *Roberson*, 346 F.3d at 80-81. Accordingly, "judicial action other than a judgment on the merits or a consent decree can support an award of attorney's fees, so long as such action carries with it sufficient judicial *imprimatur*." *Id.* at 81.

The *Roberson* court went on to hold that where the parties reached a private settlement agreement that expressly conditioned its effectiveness on the court's retaining jurisdiction to enforce the settlement, and where the Stipulation and Order of Discontinuance signed by the court also expressly provided that the court "shall retain jurisdiction over the settlement agreement for enforcement purposes," the court's order "gave judicial sanction to a change in the legal relationship of the parties," and so the plaintiffs were properly considered

"prevailing parties" entitled to an award of attorney's fees.  *Id.* at 83.  The court explained that

"the district court's retention of jurisdiction in this case is not significantly different from a

consent decree and entails a level of judicial sanction sufficient to support an award of attorney's

fees."  *Id.* at 82.[13]  The Second Circuit has also subsequently held that a court's "so ordering" a

settlement agreement that provided that dismissal of the lawsuit only took effect "[u]pon the

Court's approval and entry of this Stipulation and Order," where the court had had "extensive

involvement" in and "close management" of the settlement negotiations, likewise constituted

sufficient judicial *imprimatur* to justify prevailing party status.  *Perez v. Westchester Cnty. Dep't*

*of Corr.*, 587 F.3d 143, 148, 150-53 (2d Cir. 2009); *see also Preservation Coal. of Erie Cnty. v.*

*Fed. Transit Admin.*, 356 F.3d 444, 452 (2d Cir. 2004) (finding prevailing party status after court

order required defendants to prepare a Supplemental Environmental Impact Statement under

threat of injunction).

      A private settlement agreement, by contrast, does not "entail the judicial approval

and oversight involved in consent decrees," and is not alone a sufficient material alteration of the

parties' legal relationship to justify an award of attorney's fees.  *See Buckhannon*, 532 U.S. at

604 n.7.  Moreover, even a court's "so ordering" a stipulation of dismissal, without more, does

not carry with it a "sufficient judicial imprimatur" to confer prevailing party status, where the

stipulation does not "contain a provision expressly retaining jurisdiction to monitor compliance,"

---

[13]    *See also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (noting in dicta that "if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal – either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order [–] . . . a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist."); *A.R. v. N.Y. City Dep't of Educ.*, 407 F.3d 65, 77-78 (2d Cir. 2005) (applying *Buckhannon* and *Kokkonen* to find administrative agency's order of dismissal of action that incorporated terms of settlement agreements rendered plaintiffs "prevailing parties" entitled to attorney's fees); *Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320-21 (11th Cir. 2002) (finding that "if the district court either incorporates the terms of the settlement into its final order of dismissal *or* expressly retains jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement . . . [, which authority] clearly establishes a 'judicially sanctioned change in the legal relationship of the parties,' . . . sufficient to render [plaintiff] a 'prevailing party'" entitled to attorney's fees in an ADA action (quoting *Buckhannon*, 532 U.S. at 605)).

and "there is nothing in the record indicating that the District Court carefully reviewed the terms of the stipulation . . . before 'so ordering' it." *Torres v. Walker*, 356 F.3d 238, 244 (2d Cir. 2003); *see also Bell v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 451 F.3d 1097, 1103 (10th Cir. 2006) ("[I]f a court does not incorporate a private settlement into an order, does not sign or otherwise provide written approval of the settlement's terms, and does not retain jurisdiction to enforce performance of the obligations assumed by the settling parties, the settlement does not bear any of the marks of a consent decree and does not confer prevailing party status on the party whose claims have been compromised. A fee award cannot be based on an order that merely recognizes the fact of the parties' agreement and dismisses the case because there is no longer a dispute before it." (internal quotation marks and citations omitted)); *Hess v. Astrue*, No. 09-CV-2516 (ENV) (VVP), 2010 WL 2723221, at *2 (E.D.N.Y. Apr. 2, 2010) (recommending against prevailing party status where court only "so-ordered" the dismissal itself, and not the underlying terms of the stipulation or settlement, stating that "[s]uch a fleeting whiff was not what the Court in *Buckhannon* had in mind as a settlement bearing judicial imprimatur"), *adopted by* 2010 WL 2710447 (E.D.N.Y. July 6, 2010); *Choudhury v. Barnhart*, No. 04-CV-142 (RJH) (AJP), 2005 WL 2592048, at *2 (S.D.N.Y. Oct. 11, 2005) ("Plaintiff offers no authority to support his claim that 'so ordering' a voluntary motion for dismissal altered the legal relationship between the parties such that he 'prevailed'. . . . [Adopting the plaintiff's position] would mean that anytime a plaintiff filed a suit and then voluntarily dismissed it he would be entitled to attorneys' fees, regardless of whether his suit was meritorious. For exactly this reason the Second Circuit has held that a 'so-ordered' stipulation of dismissal – absent a provision indicating that the dismissing court intends to retain jurisdiction – does not carry with it a 'judicial imprimatur' sufficient to satisfy *Buckhannon*'s prevailing party test.").

Here, the parties entered into a private settlement agreement, in which Hugee agreed to dismiss her lawsuit and release all claims against Kimso in exchange for the modifications made to her apartment unit and $500 in cash. *See* Ex. I. The agreement did not provide for judicial supervision of the agreement's enforcement, nor did it condition its effectiveness on any action by the court. The court has not incorporated the terms of the settlement agreement into an order of the court, nor does the court have jurisdiction to enforce the terms of the settlement agreement. Indeed, the parties have not even submitted a stipulation and order of dismissal for the court to "so order." This case thus presents even less judicial *imprimatur* than the insufficient "so-ordering" action in *Torres*, 356 F.3d at 244. Moreover, the agreement itself makes no provision for attorney's fees and provides that "this Agreement shall not be deemed admission of wrongdoing, fault or liability on part of either side," and "the parties hereby expressly disclaim and deny any such liability." Ex. I at 1-2. On these facts, the settlement agreement reached by the parties was clearly a wholly private "nonjudicial alteration of actual circumstances," *Buckhannon*, 532 U.S. at 605 (internal quotation marks omitted), which does not involve any judicial *imprimatur* so as to render Hugee a prevailing party under the FHA. "Even though plaintiff[] obtained the relief [she] sought, that change was brought about by defendant and not the Court." *Hess*, 2010 WL 2710447, at *2; *see also Perez*, 587 F.3d at 152 ("[D]ismissal was effectuated by . . . [the] mutual agreement of the parties, and did not require any judicial action . . . ." (quoting *Hester Indus., Inc. v. Tyson Foods, Inc.*, 160 F.3d 911, 916 (2d Cir. 1998))).

Moreover, the judicial time, court filings, and witness inconvenience occasioned by this "highly factbound" post-settlement fee award application well exemplify the "second litigation of significant dimension" the Supreme Court specifically cautioned against

countenancing under federal fee-shifting statutes. *Buckhannon*, 532 U.S. at 609-10 (internal quotation marks omitted). Accordingly, no fee award can be entered on the FHA claim.[14]

### 2. *The Administrative Code of the City of New York*

In direct contrast to federal law, New York City's Human Rights Law expressly recognizes the catalyst theory of prevailing party status, statutorily providing:

> For the purposes of this subdivision, the term 'prevailing' includes a plaintiff whose commencement of litigation has acted as a catalyst to effect policy change on the part of the defendant, regardless of whether that change has been implemented voluntarily, as a result of a settlement or as a result of a judgment in such plaintiff's favor.

NYC Admin. Code § 8-502(f). In 2005, the City Council amended the city's Human Rights Law to clarify that "[t]he provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." *Id.* § 8-130. Moreover, courts must construe all "provisions of the City's Human Rights Law[] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011). Thus, the question of whether Hugee was a prevailing party under city law is whether Hugee's "commencement of litigation . . . acted as a catalyst to effect policy change" by Kimso, bearing in mind that I must endeavor to interpret this provision in favor of Hugee to the extent reasonably possible.

---

[14]    I further note that Hugee's structural modification requests fell squarely under the "reasonable modifications" subsection of the FHA rather than the "reasonable accommodations" subsection, meaning Kimso was only obligated to permit Hugee to make the repairs *at her own expense* – Kimso was under no obligation under the FHA to finance the modifications itself. *See* 42 U.S.C. § 3604(f)(3)(A)-(B); 24 C.F.R. § 100.203. Because the very premise of Hugee's lawsuit was that Kimso should make these repairs *at its expense*, the relief Hugee sought (and obtained) from Kimso cannot in any sense be considered relief on the merits of Hugee's FHA claim. Hugee's FHA claim therefore fails *Buckhannon*'s precept that a "plaintiff [must] receive at least some *relief on the merits* of his claim before he can be said to prevail." *Buckhannon*, 532 U.S. at 603 (internal quotation marks omitted) (emphasis added).

The facts as elicited at the hearings in this case demonstrate that for at least a year preceding the filing of this lawsuit, Hugee made repeated requests to the management of her apartment building for structural modifications to her apartment unit, which were either ignored or denied with the caveat that she could undertake such modifications at her own expense. Eventually, she joined forces with a few other tenants with mobility impairments who were similarly frustrated with inaccessibility problems and the management's unresponsiveness to their requests. These tenants decided to seek legal help with their situation. Through fellow tenant Nimely, Hugee was introduced to Hanski, who agreed to help her secure structural modifications at Kimso's expense. Hanski made similar agreements with Nimely and Davis.

On September 16, 2011, Hugee signed and sent to Kimso a letter requesting modifications. Although Hanski drafted this letter, apparently his name did not appear on the document, nor did the letter mention that Hugee had retained counsel. *Cf.* Ex. G (Kimso response letter to Hugee); Ex. B (*Nimely*, ECF No. 20) (Nimely letter to Kimso, drafted by Hanski); Compl. ¶¶ 28-31. The letter requested that Kimso respond to Hugee no later than October 3, 2011. *See* Compl. ¶ 32. Kimso did not respond to the letter in any way prior to October 3, 2011.

On October 13, 2011, this lawsuit was filed, demanding that Kimso undertake the structural modifications requested in the September 16, 2011, letter. The Summons and Complaint were served on the Secretary of State (Kimso's registered agent) on October 25, 2011, at approximately 11:30 AM. ECF No. 3.[15] The Secretary of State then forwarded the Summons and Complaint to Kimso, but the evidence does not show when Kimso received them. For his part, Shah recollects first learning of the lawsuits around November 8, but acknowledges that he

---

[15]     Nimely's Complaint was served on the Secretary of State at the same time, *see Nimely*, ECF No. 3, and Davis's Complaint was served three days later, on October 28, 2011, *see Davis*, ECF No. 2.

was not involved in the day-to-day operations of the apartments and was unaware of the previous requests for modifications made by the plaintiffs. Shah at 82. Kimso's lawyer entered a notice of appearance on November 15, 2011. ECF No. 4.

The first time Kimso showed any responsiveness to Hugee's requests was in a letter addressed to Hugee dated October 27, 2011. Ex. G. In the letter, Kimso's managing agent, Unithree, agreed to make, or investigate the feasibility of making, most of Hugee's requested modifications to her apartment unit, but generally refused to make the requested modifications to the building's public areas. *Id.*

It is undisputed that on or around November 15, 2011, Kimso started making the requested modifications to Hugee's apartment. Hugee at 23-24; Bagliore at 53; Ex. H. By December 12, 2011, the work was done, and Hugee was fully satisfied with her apartment. Ruiz at 145; Hugee at 17; Ex. J. Around the same time, Kimso completed the requested modifications in the other plaintiffs' units as well: work began on Davis's apartment on November 15 and ended on November 18, Bagliore at 59; and work began on Nimely's unit on November 17 and ended on December 7, Bagliore at 44-45.

A simple retelling of this timeline is enough to demonstrate that Hanski's intervention was clearly a catalyst for Kimso's sudden responsiveness to Hugee's requests. While Kimso had ignored her requests for over a year, once Hanski came on board, Kimso made all of Hugee's requested modifications, *at its own expense*, within a very brief time period.

The only problem here is that it is not merely Hanski's *intervention* that must catalyze Kimso's about-face; it must be the "*commencement of litigation*" that drives the change in order for Hugee to qualify as a "prevailing party." By October 27, Kimso demonstrated a willingness to provide at least some of Hugee's requested modifications. This is a mere two

days after Hugee's Complaint was served on the Secretary of State. The shortness of that time period weakens the inference that Kimso was already aware of and acting in response to the filing of the lawsuit at that time.

Nonetheless, because I am obliged to construe the city's fee-shifting provision as favorably to Hugee as possible, I conclude on this record that Hugee's lawsuit "acted as a catalyst" to alter Kimso's policy toward undertaking such modifications, after which Kimso "implemented voluntarily" the modifications. NYC Admin. Code § 8-502(f). Hugee filed and served her lawsuit *before* Kimso indicated any willingness to make any modifications. Hugee's September 16 letter to Kimso put it on notice that she would likely take further legal action if she did not receive a response by the stated deadline of October 3. When Kimso did not respond by October 3, it was reasonable for it to foresee future legal action by Hugee. Although only two days passed between service of the Complant and Kimso's first response letter to Hugee, it is entirely plausible that Kimso, aware such lawsuits may be imminent, was monitoring its legal filings closely. The Secretary of State may have forwarded the process to Kimso by overnight delivery. Kimso has presented no evidence of when it learned of the lawsuit,[16] and therefore I give Hugee the benefit of her filing and service dates. Moreover, the alacrity with which Kimso ultimately executed the modifications – undertaken entirely at Kimso's expense and taking only 27 days from beginning to end – compared with its utter unresponsiveness for the previous year of requests, raises a reasonable, if not inescapable, inference that it was the threat and instigation

---

[16] Kimso's attorney asserts in his opposition to this motion that Kimso was unaware of the lawsuit "until well after it agreed to perform the renovations." Kimso Opp. at 1. However, this assertion is unsupported by any competent factual evidence. *But see* Shah at 82 (stating that he learned of the lawsuits around Nov. 8, but acknowledging that he was unaware of any requested renovations prior to learning of the lawsuits because he doesn't handle the day-to-day management of the apartments). Shah was not a credible witness, and I do not credit his testimony regarding when he learned of the lawsuit.

of litigation that prompted Kimso's otherwise inexplicable policy reversal. I find that the lawsuit prompted the change of heart and the structural modifications to Hugee's apartment.

In sum, I conclude that Hugee was a prevailing party for purposes of New York City's Human Rights Law, rendering her eligible for an attorney fee award under section 8-502(f) of the Administrative Code of the City of New York.

B.     *Determining the Appropriate Fee Award*

"A plaintiff who has "prevail[ed]" in the litigation has established only his eligibility for, not his entitlement to, an award of fees." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 758 (2d Cir. 1998). "The district court retains discretion to determine, under all the circumstances, what constitutes a 'reasonable' fee, and in appropriate circumstances the court may conclude that, even though a plaintiff has formally prevailed, no award of fees to that plaintiff would be reasonable." *Id.* (internal citations omitted). "[A] 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672 (2010).

In awarding attorney's fees under the New York City Human Rights Law, the court can use the same principles that govern such awards in federal civil rights cases. *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d 421, 426, 429 (2004) (holding that NYC Admin. Code § 8-502(f) should be interpreted "consistently with federal precedent" because "the attorney's fee provision of the New York City Human Rights Law is textually indistinguishable from the federal statutes"). The starting point for determining a reasonable attorney's fee in a federal civil rights action is the "lodestar," which is "calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) (internal quotation omitted). The lodestar figure constitutes a "presumptively

reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522

F.3d 182, 190 (2d Cir. 2008). It is "strong[ly]" presumed that the lodestar represents a

reasonable fee, precisely because the lodestar's calculus "includes most, if not all, of the relevant

factors constituting a 'reasonable' attorney's fee." *Perdue*, 130 S. Ct. at 1673 (internal quotation

omitted). For example, the novelty and complexity of a case will be subsumed in the

determination of the reasonable number of hours spent, and the quality of an attorney's

performance will be reflected in the reasonable hourly rate. *Id.* Thus, "the lodestar method

produces an award that *roughly* approximates the fee that the prevailing attorney would have

received if he or she had been representing a paying client who was billed by the hour in a

comparable case." *Id.* at 1672; *see also Arbor Hill*, 522 F.3d at 190 (holding that the court must

determine the "reasonable hourly rate . . . a paying client would be willing to pay," recognizing

that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case

effectively"). The burden is on the party seeking attorney's fees to submit sufficient evidence to

support the hours worked and the rates claimed. *Hensley v. Eckerhart*, 461 U.S. 424, 433

(1983).

1.      *Reasonable Hourly Rate*

The court must determine the reasonable hourly rate by reference to "the

prevailing market rates in the relevant community," *Perdue*, 130 S. Ct. at 1672 (quoting *Blum v.

Stenson*, 465 U.S. 886, 895 (1984)), "for similar services by lawyers of reasonably comparable

skill, experience, and reputation." *Blum,* 465 U.S. at 895 n.11. The relevant community is the

district in which the case is litigated. *Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 174 (2d

Cir. 2009); *Lochren v. Cnty. of Suffolk*, 344 F. App'x 706, 708 (2d Cir. 2009); *Arbor Hill,* 522

F.3d at 191. The burden rests with the prevailing party "to justify the reasonableness of the

requested rate." *Blum,* 465 U.S. at 895 n.11.  The attorney should "establish his hourly rate with 'satisfactory evidence—in addition to the attorney's own affidavits.'" *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1059 (2d Cir. 1989) (quoting *Blum,* 465 U.S. at 895 n.11).  The court may also rely on "judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district."  *Farbotko v. Clinton Cnty.*, 433 F.3d 204, 209 (2d Cir. 2005).  "The specific rate that is reasonable for a given attorney depends on such factors as the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case."  *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 204 (E.D.N.Y. 2006) (quoting *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997)); *see also Simmonds v. N.Y. City Dep't of Corr.*, No. 06 Civ. 5298 (NRB), 2008 WL 4303474, at *3 (S.D.N.Y. Sept. 16, 2008) ("The gravamen of a reasonable rate remains the market rate that a reasonable client would expect to pay given 'the nature of the representation and type of work involved in a case.'" (quoting *Arbor Hill,* 522 F.3d at 184 n.2)).

Hanski requests that the court award him a rate of $400 per hour.  He supports his request with a declaration asserting that $400 per hour is his "current hourly rate," Hanski Dec. ¶ 27, ECF No. 30-1, and with citations to case law that he contends stand for the proposition that "$400 is a reasonable current rate for a law firm partner prosecuting for victims of housing discrimination."  Pl.'s Mo. for Atty Fees at 5.

Recent opinions from the Eastern District of New York have determined that reasonable hourly rates in this district "are approximately $300-$450 per hour for partners, $200-$300 per hour for senior associates, and $100-$200 per hour for junior associates."  *Pilitz v. Inc. Village of Freeport*, No. 07-CV-4078 (ETB), 2011 WL 5825138, at *4 (E.D.N.Y. Nov. 17, 2011) (citing *Builders Bank v. Rockaway Equities, LLC*, No. 08-CV-3575 (MDG), 2011 WL 4458851,

at *8 (E.D.N.Y. Sept. 23, 2011) ("The range in this district is between $300 and $450 for partners, between $200 and $300 for senior associates and between $100 and $200 for junior associates."); *Olsen v. Cnty. of Nassau*, No. 05-CV-3623 (ETB), 2010 WL 376642, at *4 (E.D.N.Y. Jan. 26, 2010) (determining reasonable hourly rates to be $375-$400 for partners, $200-$250 for senior associates and $100-$175 for junior associates); *Gutman v. Klein*, No. 03-CV-1570 (BMC), 2009 WL 3296072, at *2 (E.D.N.Y. Oct. 9, 2009) (approving rates of $300-$400 for partners, $200-$300 for senior associates and $100-$200 for junior associates)).[17] The size of the firm may be considered, as large firms tend to charge higher hourly rates than small firms. *Chambless*, 885 F.2d at 1059 (noting that "smaller firms may be subject to their own prevailing market rate"); *Cioffi v. N.Y. Cmty. Bank*, 465 F. Supp. 2d 202, 219 (E.D.N.Y. 2006); *Brady*, 455 F. Supp. 2d at 206-07; *Murray ex rel. Murray v. Mills*, 354 F. Supp. 2d 231, 236 (E.D.N.Y. 2005) (noting that hourly rates tend to be higher at large firms to compensate for higher overhead costs). Although solo practitioners rarely command the fees of partners in large law firms, "courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 143 n.6 (2d Cir. 2007) (internal quotation marks omitted); *see Colon*, 2012 WL 691544, at *20-21 (approving rate of $350 per hour for "seasoned" solo practitioners with over

<hr />

[17]  *See also Colon v. City of New York*, Nos. 09 CV 0008 (JBW), 09 CV 0009(JBW), 2012 WL 691544, at *20 (E.D.N.Y. Feb. 9, 2012) ("[R]ates of $300 to $400 per hour for partners have been considered reasonable in the Eastern District."), *report and recommendation adopted by* 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012); *Luca v. Cnty. of Nassau*, 698 F. Supp. 2d 296, 301 (E.D.N.Y. 2010) (awarding partner with over 25 years of experience $400, appellate counsel with 20 years of experience $350 and solo practitioner with 20 years of experience $275); *Artemide Inc. v. Spero Elec. Corp.*, No. 09-CV-1110 (DRH) (ARL), 2010 WL 5452075, at *3 (E.D.N.Y. Nov. 23, 2010) ("Current prevailing rates for partners in the Eastern District range from $350 to $450."), *report and recommendation adopted by* 2010 WL 5452077 (E.D.N.Y. Dec. 28, 2010); *Lochren v. Cnty. of Suffolk*, No. 01-CV-3925 (ARL), 2010 WL 1207418, at *3 (E.D.N.Y. Mar. 23, 2010) (awarding partner with 49 years of experience $450); *Morgenstern v. Cnty. of Nassau*, No. 04-CV-58 (ARL), 2009 WL 5103158, at *9 (E.D.N.Y. Dec. 15, 2009) (awarding $400 per hour to partners and $200-$250 to associates); *Duverger v. C & C Duplicators, Inc.*, No. 08-CV-0721 (DRH) (ARL), 2009 WL 1813229, at *2 (E.D.N.Y. June 25, 2009) ("Overall hourly rates for attorneys approved in recent Eastern District of New York cases have ranged from $200 to $350 for partners, $200 to $250 for senior associates, $100 to $150 for junior associates and $70 to $80 for legal assistants." (quoting *Cruz v. Henry Modell & Co.*, No. 05-CV-1450 (AKT), 2008 WL 905351, at *7 (E.D.N.Y. Mar. 31, 2008))).

20 years of litigation experience); *Garland v. Cohen & Krassner*, No. 08-CV-4626 (KAM)(RLM), 2011 WL 6010211, at *11 (E.D.N.Y. Nov. 29, 2011) (reducing rate of solo practitioner with 20 years of experience to $300 per hour); *Brown v. Starrett City Assocs.*, No. 09–CV–3282 (JBW), 2011 WL 5118438, at *6 (E.D.N.Y. Oct. 27, 2011) (approving rate of $300 per hour for solo practitioner with 12 years experience, with the past 7 years concentrating in civil rights cases); *Regan v. Conway*, 768 F. Supp. 2d 412, 418 (E.D.N.Y. 2011) (approving rate of $325 for solo practitioner); *Luca*, 698 F. Supp. 2d at 301 (awarding solo practitioner with 20 years of experience $275); *Cioffi*, 465 F. Supp. 2d at 219 ("Recent cases in the Eastern District of New York have held that $175.00 to $200.00 per hour is an appropriate rate for a solo practitioner.") (collecting cases).

The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields. *See Luca*, 698 F. Supp. 2d at 301 (awarding rate of $400 per hour to partner with over 25 years of experience "specializing in plaintiffs-side civil rights cases," whose "peers recognize him as an authority in his specialty, as evidenced by his numerous teaching and speaking engagements," and who has handled roughly 180 civil rights cases in the Eastern District of New York alone); *Brady*, 455 F. Supp. 2d at 205-08 (awarding rate of $350 per hour to partner with "over ten years experience practicing law," "impressive academic and professional achievements establish[ing] that he is an experienced labor lawyer and an expert in his field," whose "writing has been published in several scholarly and professional journals," and who "has made multiple appearances as a labor law expert in the lay media"); *Lochren*, 2010 WL 1207418, at *3 (awarding partner with 49 years of experience $450 per hour); *Duke v. Cnty. of Nassau*, No. 97-CV-1495 (JS), 2003 WL 23315463, at *2

(E.D.N.Y. Apr. 14, 2003) (awarding $300 per hour – then a high-water mark for the Eastern District of New York – to "experienced trial attorney with many years of experience before the federal bar," "specializing in the practice of civil rights law," who had achieved a significant victory after a jury trial).

Hanski's declaration provides some background on his experience in civil rights litigation. Hanski graduated from the Law Center of the University of Southern California in 1997, where he was on the Interdisciplinary Law Journal. Hanski Dec. ¶ 21. After graduation, Hanski clerked for two federal bankruptcy court judges. *Id.* ¶ 22. Hanski then worked in private practice for two years, a year each at two different law firms, on unspecified matters. *Id.* ¶ 23. Neither of the two law firms that Hanski worked for have a practice in civil rights or housing discrimination litigation. *See* Dewey & LeBoeuf, Services, http://www.deweyleboeuf.com/en/ Services; Whitman Breed Abbott & Morgan LLC, Practice Areas, http://whitmanbreed.com/ 1_practice.html.

Beginning in September 2000, Hanski enrolled in Columbia University's Graduate School of Architecture, where he earned a Masters of Science in Real Estate Development in September 2001. Hanski Dec. ¶ 24. From March 2002 through January 2011, Hanski worked in real estate private equity, which one industry organization has defined as "equity capital raised for a dedicated program of investing directly into property, primarily." *See* Private Equity Real Estate at 34 (May 2009), *available at* http://www.privateequityrealestate.net/ resources/PERE%2030/PERE_30_ExecutiveSummary.pdf (last visited March 27, 2012).

In early 2011, Hanski "decided to refocus [his] career on the legal side of real estate, particularly as relates to the rights of people with disabilities in relation to the built environment and thereafter formed Hanski Law Practice, LLC." Hanski Dec. ¶ 26. A search of

the dockets of the Eastern and Southern Districts of New York reveals that through his newly created law practice, Hanski has filed 22 lawsuits – all since August 2011, and many with the same plaintiffs that appear in the related cases before me: Thomas Nimely and Alona Davis.[18]

Although I commend Hanski on his intrepidity in embarking on this new career path, his current level of experience in civil rights litigation is much closer to a junior associate than the senior partner whose hourly rate he hopes to claim. Hanski's declaration leads me to conclude that he had no prior experience bringing or litigating civil rights claims – and, indeed, apparently no litigation experience whatsoever – prior to forming Hanski Law Practice, LLC, in 2011, and filing the lawsuits initiated in the fall 2011. As best I can tell, Hanski had never drafted or filed a complaint in his life until August 9, 2011,[19] two months before filing Hugee's lawsuit. Hanski's appearances in my courtroom have done nothing to disabuse me of the perception that he is not an experienced trial lawyer. Indeed, Hanski's own billing records betray his nascent concentration in this field. Belying his claimed familiarity with disability

---

[18]     In addition to the three related cases against Kimso pending before me, there are four other cases brought by Hanski in the Eastern District of New York: *Nimely v. Moftah et al.*, No. 1:11-cv-04149-ENV-JMA (E.D.N.Y.) (filed 08/26/11); *Davis v. Parisi Bay Street, LLC et al.*, No. 1:11-cv-05150-NG-JO (E.D.N.Y.) (filed 10/24/11); *Thomas v. Hsiao et al.*, No. 1:12-cv-01128-ILG-SMG (E.D.N.Y.) (filed 03/08/12); *Tuchina v. 64th Apartment Corp. et al.*, No. 1:12-cv-01129-NGG-JMA (E.D.N.Y.) (filed 03/08/12).

In the Southern District of New York, there are 15 lawsuits filed by Hanski: *Nimely v. SC Water View LLC et al.*, No. 1:11-cv-05535-PAC (S.D.N.Y.) (filed 08/09/11); *Nimely v. Whitehall Properties, LLC et al.*, No. 1:11-cv-05536-RMB-MHD (S.D.N.Y.) (filed 08/09/11; closed 03/12/12); *Nimely v. 55 Broad Street L.P. et al.*, No. 1:11-cv-05809-CM (S.D.N.Y.) (filed 08/19/11; closed 11/07/11); *Nimely v. 130 Water (NY) L.L.C. et al.*, No. 1:11-cv-05811-DLC (S.D.N.Y.) (filed 08/19/11; closed 02/08/12); *De La Rosa v. 415 Second Owner's Corp. et al.*, No. 1:11-cv-07661-DLC (S.D.N.Y.) (filed 10/28/11; closed 02/10/12); *De La Rosa v. Dream Team Associates, LLC et al.*, No. 1:11-cv-07851-AJN-FM (S.D.N.Y.) (filed 11/03/11); *De La Rosa v. Dream Team Associates, LLC et al.*, No. 1:11-cv-07853-DCF (S.D.N.Y.) (filed 11/03/11); *De La Rosa v. Gristede's Foods Inc.*, No. 1:11-cv-08197-HBP (S.D.N.Y.) (filed 11/14/11); *Nimely v. 112 Fulton Street LLC et al.*, No. 1:11-cv-09031-PAC (S.D.N.Y.) (filed 12/09/11); *Nimely v. 201 Pearl Street L.L.C. et al.*, No. 1:11-cv-09032-PGG (S.D.N.Y.) (filed 12/09/11); *De La Rosa v. Est Midtown Plaza Housing Company, Inc. et al.*, No. 1:11-cv-09190-ALC-AJP (S.D.N.Y.) (filed 12/15/11; closed 02/29/12); *Nimely v. Leviev Fulton Club, LLC et al.*, No. 1:12-cv-01626-DAB (S.D.N.Y.) (filed 03/06/12); *Nimely v. Mazal Group et al.*, No. 1:12-cv-01627-NRB (S.D.N.Y.) (filed 03/06/12); *Nimely v. 150 William Street Associates L.P. et al.*, 1:12-cv-01628-GBD (S.D.N.Y.) (filed 03/06/12); *Nimely v. Liberty Street Realty LLC et al.*, No. 1:12-cv-01629-NRB (S.D.N.Y.) (filed 03/06/12).

[19]     *See Nimely v. SC Water View LLC et al.*, No. 1:11-cv-05535-PAC (S.D.N.Y.) (filed 08/09/11); *Nimely v. Whitehall Properties, LLC et al.*, No. 1:11-cv-05536-RMB-MHD (S.D.N.Y.) (filed 08/09/11; closed 03/12/12).

discrimination law, Hanski required 33.9 hours to research and prepare the complaint in this case – in spite of its striking similarity to the complaints he filed around the same time in the *Nimely* and *Davis* cases. *See* Hanski Billing Records at 4-7, ECF No. 30-2. Later, in preparation for the January 5 hearing, Hanski spent 9 hours researching the catalyst theory of fee recovery under the City Administrative Code. *See id.* at 14 (entry #94). While I do not begrudge Hanski the time he invested to learn the relevant law, and while I applaud careful lawyering, Hanski's billing records nonetheless make clear that his prosecution of this case is not buttressed by the easy wisdom accreted over decades of experience that is brandished by the top-earning civil rights lawyers in this district; rather he is building his very foundation in the subject area as he goes. There is nothing wrong with that; every lawyer must start there. But clients and adversaries are not asked to sponsor this professional development process to the tune of $400 per hour.

I conclude that Hanski's reasonable billing rate is $200 per hour, which is commensurate with the high end of a junior associate rate or the low end of a senior associate rate,[20] and which falls within the range awarded to solo practitioners in this district.

I also accept Hanski's rate reduction of 50% for travel time. *See Perdue*, 130 S. Ct. at 1670 (apparently approving of district court's decision to "halve[] the hourly rate for travel hours"); *Barfield v. N.Y. City Health & Hospitals Corp.*, 537 F.3d 132, 139, 151 (2d Cir. 2008) (affirming district court's determination that "travel time by counsel should be compensated at half-rate, in accordance with established court custom"); *U.S. ex rel. Feldman v. Van Gorp*, No. 03 Civ. 8135(WHP), 2011 WL 651829 (S.D.N.Y. Feb. 9, 2011) (discounting fees for necessary

---

[20]     I note that most associates awarded a rate of $200 per hour by the Eastern District of New York have substantially more experience in this field than Hanski. *See, e.g.*, *Pilitz*, 2011 WL 5825138, at *5 (awarding senior associates $200 per hour); *Green v. City of New York*, No. 05-CV-429(DLI) (ETB), 2009 WL 3088419, at *5 (E.D.N.Y. Feb. 13, 2009) (awarding associate with six years of experience $200 per hour), *recommended again on reconsideration*, 2009 WL 5386046, at *3 (E.D.N.Y. Dec. 8, 2009), *adopted in relevant part*, 2010 WL 148128, at *11 (E.D.N.Y. Jan. 14, 2010), *aff'd*, 403 F. App'x 626, 629 (2d Cir. 2010); *Brady*, 455 F. Supp. 2d at 208 (awarding associates with five years of experience $200 per hour).

travel time by 50%); *LV v. N.Y. City Dep't of Educ.*, 700 F. Supp. 2d 510, 526 (S.D.N.Y. 2010) ("Courts in this Circuit regularly reduce attorneys' fees by 50 percent for travel time."); *Kochisarli v. Tenoso*, No. 02-CV-4320 (DRH)(MLO), 2008 WL 1882662, at *8 (E.D.N.Y. Apr. 24, 2008) ("[T]ravel time is appropriately reimbursed at one-half of the determined hourly rate."); *Cioffi*, 465 F. Supp. 2d at 219 ("[T]ravel time . . . is to be reimbursed at one-half of the determined hourly rate."). *See generally McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 98 (2d Cir. 2006) ("[D]ifferent rates can be set for different litigation tasks" (citing *Cohen v. W. Haven Bd. of Police Comm'rs.*, 638 F.2d 496, 505 (2d Cir. 1980))).

However, I decline to award Hanski his requested 25% rate for ministerial tasks, and instead disallow compensation for those hours entirely. *See Barfield*, 537 F.3d at 139 (approving district court's determination that time "spent on administrative tasks should not be compensated at all"); *Concrete Flotation Sys., Inc. v. Tadco Const. Corp.*, No. 07-CV-319 (ARR)(VVP), 2010 WL 2539661, at *1 (E.D.N.Y. June 17, 2010) (excluding all fees billed for "secretarial work," as well as travel time); *Kochisarli*, 2008 WL 1882662, at *9 (excluding all time spent on "secretarial duties" as "noncompensable"); *Jennette v. City of New York*, 800 F. Supp. 1165, 1170 (S.D.N.Y. 1992) (disallowing compensation for ministerial time because "this time does not properly belong in the category of legal work for which a premium rate may be sought . . . and . . . is normally subsumed within an attorney's overhead" (internal quotation marks and alterations omitted)).

2.      *Hours Expended*

The fee applicant "bears the burden of . . . documenting the appropriate hours expended."  *Hensley*, 461 U.S. at 437.  Thus, fee award applications must be documented with

"contemporaneous time records . . . [that] specify, for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983); *see also id.* at 1147 ("[C]ontemporaneous time records are a prerequisite for attorney's fees in this Circuit.").  In determining the amount of hours reasonably expended, the court must "examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998) (quoting *DiFilippo v. Morizio*, 759 F.2d 231, 235 (2d Cir. 1985)).  If the documentation is inadequate, the court may reduce the award accordingly.  *See Hensley*, 461 U.S. at 433-34.  In addition, the court should exclude "excessive, redundant, or otherwise unnecessary" hours from the lodestar calculation.  *Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (quoting *Hensley*, 461 U.S. at 434); *accord Luciano*, 109 F.3d at 116 ("If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation.").  "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger*, 160 F.3d at 876 (quoting *DiFilippo*, 759 F.2d at 236).  "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Hensley*, 461 U.S. at 434.  District courts are authorized "to make across-the-board percentage cuts in hours as a practical means of trimming fat from a fee application." *Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987)).

In Hanski's initial declaration, he seeks compensation for a total 134.5 hours of attorney time, 7.5 hours of travel time,[21] and 5.3 hours spent on ministerial activities,[22] in litigating Hugee's case. Hanski Dec. In his supplemental declaration, Hanski seeks reimbursement for an additional 15.8 hours of attorney time and 0.4 hours spent on ministerial activities in relation to the instant motion for attorney's fees. Hanski Supp. Dec., ECF No. 33.

As mentioned above, Hanski will not be compensated for ministerial activities. Thus, the 5.3 hours from his initial declaration, and the 0.4 hours from his supplemental declaration, will be excluded from the fee award. In addition, entry #104 from Hanski's initial declaration – 1.5 hours for "pick up transcript for 1-05-12 hearing (reporter leaving on holiday and req'd check)" (capitalization omitted) – and entry #5 from Hanski's supplemental declaration – 0.9 hours for "prepared motion for filing and ECF file motion with exhibits" – similarly should have been classified as ministerial time, and are hereby excluded. Accordingly, a total of 8.1 hours are excluded from Hanski's fee award as noncompensable ministerial time.[23]

Kimso does not object to Hanski's claimed 7.5 hours of travel time,[24] which was primarily spent traveling to Staten Island to visit Hugee. I have already ruled above that Hanski inappropriately classified 1.5 hours (entry # 104) as attorney travel, when in fact it was ministerial. Subtracting this 1.5-hour time entry leaves Hanski with a claim for 6 hours of travel

---

[21] Although Hanski states that his travel time totals 7.6 hours, he appears to have inadvertently included a 0.10 hour from entry number 15 that was put in both the "attorney time" and "attorney travel" columns. Because this entry relates to a telephone call, I conclude Hanski meant to label this 0.10 hour as attorney time rather than travel time.

[22] Although Hanski's initial declaration states that the total claimed ministerial time is 5.1 hours, the sum of the entries provided in his billing records is 5.3 hours.

[23] The ministerial time entries appear in entry numbers 16, 37, 40-42, 44-45, 71, 73, 104 and 106 of Hanski's initial declaration and in entry numbers 5 and 10 of Hanski's supplemental declaration. I note that entry number 71 from Hanski's initial declaration appears to account for time spent traveling to court for a court conference, which Hanski might have been able to bill as travel time. However, because he has classified it as ministerial, I will not second-guess his reasoning.

[24] As noted above, I have subtracted from Hanski's claimed 7.6 hours of travel time a stray 0.1 hour from entry number 15 which appears to be in error.

time.[25]  I find this hourly figure to be reasonable, and, as noted above, compensable at a rate of 50% of Hanski's full reasonable rate, or $100 per hour.  Therefore, I award $600 in travel time.

Finally, Hanski seeks compensation for a total of 150.3 hours of attorney time (134.5 hours in his initial declaration and 15.8 hours in his supplemental declaration).  I have already ruled above that 0.9 hours in Hanski's supplemental declaration (entry #5) was inappropriately classified as attorney time, when in fact it was ministerial time, so I will exclude that time from Hanski's fee award.  This leaves 149.4 claimed hours of attorney time.  Although Kimso objects that "Hanski submits 16 pages of billing records in a case that did not raise any complex issues and was settled in the early stages," Kimso Opp. at 2, I have already reduced Hanski's hourly rate to account for his relative inexperience in this type of litigation, so I need not similarly reduce his claimed hours on this ground.

However, Kimso is correct to point out that certain tasks included in Hanski's billing records equally benefited each of his three clients suing Kimso for disability discrimination – Davis, Nimely, and Hugee.  Accordingly, the time spent on these tasks should be allocated equally across each of the three cases.  In other words, the hours on such shared-benefit tasks billed to Hugee's matter specifically should be reduced by 1/3.  The first such shared-benefit task was the time Hanski spent researching the complaint's causes of action – because the three complaints filed against Kimso asserted identical causes of action, the time Hanski spent researching and drafting the legal bases of Hugee's complaint should be reduced by 1/3.  Similarly, the time Hanski spent investigating Kimso's building structure or compliance with disability laws accrued to the benefit of each of his three clients, and thus should be reduced by 1/3.  Finally, the time Hanski spent preparing for the January 5, 2012, hearing should be allocated equally across each of the three clients' cases.  The hearing was held to address factual

_____

[25]     The travel time entries appear in entry numbers 1, 11 and 92 of Hanski's initial declaration.

disputes arising in all three of the cases. The court ordered all three plaintiffs to appear and testify, as well as all other persons who were involved in the drafting or presenting to the plaintiffs of documents purporting to terminate the lawsuits and/or fire Hanski. In the end, the only plaintiff who testified at the January 5 hearing was Nimely. However, according to Hanski, up until the morning of the hearing he believed that Hugee would also attend and testify.[26] Hanski Reply at 4, ECF No. 32. Moreover, Kimso's witnesses testified to, and Hanski cross-examined them on, factual matters relating to all three plaintiffs. Clearly, Hanski's preparation for this hearing related to all three plaintiffs' cases, and his time should be allocated accordingly.

Hanski asserts summarily in his declaration that the attorney time he purports to bill on the Hugee case is "already reduced for time expended that can be allocated to the two other cases involving this defendant," such as "legal research for some causes of action, and related complaint drafting," and thus "[t]ime spent on those items has been reduced to 1/3rd of the total hours for the particular items." Hanski Dec. ¶ 28. However, Hanski's billing records do not reflect which entries have been reduced in this way, nor do they indicate what the original time investment was prior to such a reduction. The burden is on the party claiming fees to supply adequate documentation; if the documentation is inadequate, the court may reduce the award accordingly. *See Hensley*, 461 U.S. at 433-34.

I find that Hanski's documentation of his method of allocating his time across these three related cases is inadequate to discern whether he has overbilled for tasks on the Hugee matter in particular. Indeed, for many tasks that would clearly be subject to this 1/3 reduction, I cannot fathom that the records Hanski has produced are actually only 1/3 of the real time he invested in the task. For example, on January 1, 2012, alone, Hanski purports to bill 9.3

---

[26] Davis's absence was excused by the court on January 3, 2012, due to her hospitalization. *See* Electronic Order dated Jan. 3, 2012, *Davis*.

hours that were spent preparing his direct examination for the January 5, 2012, hearing. How Hanski has already reduced this figure by 1/3 – meaning he actually spent roughly 28 hours on this task in a 24-hour day – is beyond me. Similarly, on January 2, 2012, Hanski purports to bill in the Hugee case alone 14.3 hours that he spent drafting cross-examination questions and conducting other preparation for the upcoming hearing. Once again, I am skeptical that this 14.3-hour figure was arrived at by Hanski's working 42.9 hours in a single day and then dividing it by 3. Accordingly, I conclude that despite Hanski's assurances, he has not properly allocated across the three related cases the time he spent on tasks that promoted each of the cases, especially the time spent researching and preparing the complaints and the time spent preparing for the January 5, 2012, hearing. I therefore will reduce all such entries by 1/3 to reflect his economies of scale in suing Kimso three times.

Accordingly, 83.4 total hours of attorney time claimed by Hanski will be compensated in full (68.5 hours from the initial declaration and 14.9 hours from the supplemental declaration).[27] An additional 66 hours of attorney time will be reduced by 1/3, producing another 22 hours for full compensation.[28] Thus, I award Hanski a total of 105.4 hours of attorney time compensated at a rate of $200 per hour, for a total of $21,080.

3.      *Costs*

Reasonable out-of-pocket expenses are generally reimbursed as a matter of right in connection with an award of attorneys' fees. *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989). Hanski seeks reimbursement of $1,200 of costs, largely comprised of filing fees, transcript costs, and taxi fares. *See* Hanski Costs Record, ECF No. 30-3. Kimso objects to this request on the ground that plaintiff's "expenditures of $305 for taxis to

---

[27]      Although entry #64 would qualify for full compensation, Hanski's claimed time for this entry is 0.
[28]      The entries I so reduce are: 3-6, 17, 21-22, 24-26, 28-33, 43-44, 64, 77-91, 95-101, 103-105.

and from the January 27, 2012 hearing are outrageously excessive." Kimso Opp. at 4. But it was Kimso's own conduct that necessitated the evidentiary hearing in this case. If Shah had not cut Hanski out of the settlement negotiations, and had not sent Graham to induce Hugee to sign false affirmations and letters to this court and the New York State Bar, the pitched factual dispute that gave rise to the hearing would not have occurred. Moreover, Hugee, who lives on Staten Island, is a disabled woman confined to a wheelchair. The court required her appearance at the hearing in Brooklyn at 9:30 A.M. sharp. Transport for such a woman under these conditions is limited, and taxi fare in a wheelchair-accessible van totaling roughly $150 each way is not excessive. The defendant is reminded of the principle that it "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (internal quotation marks omitted).

I find all of the costs enumerated by Hanski totaling $1,200 to be reasonable and appropriately compensable.

CONCLUSION

In sum, Hugee is a prevailing party under New York City's Human Rights Law, and is entitled to a reasonable fee award. I award a total fee to Hugee of $22,880, which is comprised of $21,080 for attorney hours, $600 for travel time and $1,200 for costs.

While this award is large for a litigation that seemingly barely got off the ground, the size of the fee is directly traceable to Kimso's – and, in particular, Shah's – reprehensible conduct with respect to this lawsuit. On Kimso's behalf, Shah drafted a series of false documents and used Hugee's sister to induce Hugee to sign them without understanding them or consulting with her attorney. After settling the lawsuit for $500 cash in Hanski's absence,

Kimso thereafter refused to modify the settlement to stipulate to pay a "reasonable fee award to be determined by the court," as the court repeatedly recommended that the parties do. Instead, Kimso has fiercely litigated every aspect of the settlement and fee award in a way that is directly counter to its aim of avoiding paying damages or attorney fees altogether. Kimso's outrageous conduct in this case is directly responsible for the court's extensive intervention in what is otherwise a garden-variety housing discrimination case. Accordingly, I have carefully reviewed all of Hanski's billing records and conclude that the fee here awarded is reasonable and appropriate, and "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," even against an adversary like Kimso. *Perdue*, 130 S. Ct. at 1672.

So ordered.

John Gleeson, U.S.D.J.

Dated: April 3, 2012
      Brooklyn, New York